IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FREDRICK VARNER,

    Petitioner,                           No. CIV S-07-2494 MCE CHS P

    vs.

D.K. SISTO, Warden, et al.,

    Respondents.           FINDINGS AND RECOMMENDATIONS

                                /

## I. INTRODUCTION

Petitioner Fredrick Varner is a state prisoner proceeding pro se with a petition for writ of habeas corpus brought pursuant to 28 U.S.C. §2254. Petitioner is currently serving a sentence of 17 years to life following his 1981 conviction for second degree murder in the Alameda County Superior Court. Petitioner challenges the execution of that sentence, and specifically, the October 20, 2006 decision of Governor Schwarzenegger reversing a grant of parole by the Board of Parole Hearings. Petitioner presents a single claim for review: that the governor's decision is unsupported by any reliable evidence in the record in violation of his right to due process of law. Based on a thorough review of the record and the applicable law, it is recommended that the petition be denied.

/////

## II.  BACKGROUND

Petitioner declined to discuss his commitment offense with the Board at his 2006 hearing.  The presiding commissioner read into the record the following summary of the offense, taken from petitioner's probation report:

> On September 5, 1980 at 3:45 p.m. the defendant and Orlando Summers... were in the 1000 block of 60th Street [in Oakland, California].  The defendant had a rifle, which he swung like a baseball bat at Summers.  Summers tried to protect himself with his hands.  The defendant attempted to fire the rifle three times at Summers but the rifle malfunctioned and just clicked.  The fourth time the rifle fired and Summers fell face down at the curb.  The defendant stood over Summers and fired several more shots at Summers back.  Defendant put the rifle in the car and drove off.

It was further noted that petitioner gave the following statement to the probation officer at the time that report was created:

> According to the defendant the victim had been more or less harassing him for several days.  On the day of the offense the victim appeared to be drunk and started harassing the defendant verbally.  He then pulled out a knife and struck the defendant several times.  During this time the defendant was fending the victim off by pushing him away.  Finally the defendant went to his car and got his rifle to protect himself.  He had trouble getting the bullets to stay in the magazine and... when he tried to shoot at the victim to hit him in the legs the gun misfired several times.  During a struggle the gun went off and hit the victim in the eye.  The victim fell down and was clutching the defendant's legs.  The defendant did not know the victim had been shot.  Defendant says he is not a good shot and aiming again at the victim's legs -- he was aiming the gun at the victim's legs when he pulled the trigger several more times and hit the victim in the back.  Defendant feels witnesses who testified against him may have been frightened by the victim's family to report the incident as they did and says he was acting in self-defense.  He says the knife the victim was using was thrown into a nearby lot where it was later found by police.

(Probation Officer's Report and Recommendation, April 30, 1981, at 2-3.)

Petitioner was convicted by jury of second degree murder with use of a firearm and sentenced to a term of 17 years to life in state prison.  His minimum eligible parole date passed on November 9, 1990.  On May 26, 2006, a panel of the Board of Prison Terms ("Board") conducted a ninth subsequent hearing to determine petitioner's suitability for parole and

concluded that he would not pose an unreasonable risk of danger to society or a threat to public safety if released and thus that he was suitable for parole.

On October 20, 2006, Governor Schwarzenegger reversed the Board's grant of parole. Petitioner challenged the governor's reversal in the Alameda County Superior Court; his claims were denied in a written decision dated June 3, 2007. The California Court of Appeal, First District, and the California Supreme Court denied petitioner's claims, but without written opinions.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## V.  DISCUSSION

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging a due

1  process violation must first demonstrate that he or she was deprived of a protected liberty or
2  property interest, and then show that the procedures attendant upon the deprivation were not
3  constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60
4  (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).
5        A protected liberty interest may arise from either the Due Process Clause itself or
6  from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). The United States
7  Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole
8  date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, if a state's statutory parole
9  scheme uses mandatory language, it "creates a presumption that parole release will be granted"
10 when or unless certain designated findings are made, thereby giving rise to a constitutional
11 liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*,
12 442 U.S. 1, 12 (1979)).
13       In California, Penal Code section 3041 sets forth the state's legislative standards
14 for determining parole for life-sentenced prisoners. Subsection (a) provides that "[o]ne year prior
15 to the inmate's minimum eligible parole release date a panel... shall meet with the inmate and
16 shall normally set a parole release date." Cal Penal Code §3041(a). Subsection (b) provides an
17 exception to the regular and early setting of a lifer's term, if the Board determines "that the
18 gravity of the current convicted offense or offenses, or the timing and gravity of current or past
19 convicted offense or offenses, is such that consideration of the public safety requires a more
20 lengthy period of incarceration..." Cal. Penal Code §3041(b). Thus, California state prisoners
21 who have been sentenced to prison with the possibility of parole have a clearly established,
22 constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505
23 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128
24 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at
25 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).
26 /////

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16.

Additionally, as a matter of *state* law, denial of parole to California inmates must be supported by at least "some evidence" demonstrating future dangerousness. *Hayward v. Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002), *In re Lawrence*, 44 Cal.4th 1181 (2008), and *In re Shaputis*, 44 Cal.4th 1241 (2008)). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state." *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010). The federal Due Process Clause requires that California comply with its own "some evidence" requirement. *See Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam). Thus, a reviewing court such as this one must "decide whether the California judicial decision approving the... decision rejecting parole was an "unreasonable application" of the California 'some evidence' requirement, or was "based on an unreasonable determination of the facts in light of the evidence." *Hayward*, 603 F.3d at 562-63.

The analysis of whether some evidence supports denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations. *See Irons*, 505 F.3d at 851. This court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle." *Id*.

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers. The

regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. §2402(b). The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal. Code Regs. §2402(c)-(d). The overriding concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. Thus, the proper articulation of the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that the inmate's release would unreasonably endanger public safety. *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008). In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *In re Lawrence*, 44 Cal. 4th at 1227.

   The statutory procedure guiding the governor's review of a parole decision of an inmate sentenced to an indeterminate term for a murder conviction is contained in title 15, section 3041.2 of the California Code of Regulations. Although the governor undertakes an independent, de novo review of an inmate's suitability for parole, his decision must be based on the same statutory factors and the same evidentiary record that was before the Board. *In re Rosenkrantz*, 29 Cal.4th 616, 661 (2002). The governor is entitled to weigh the suitability factors differently than the Board and may choose to be more stringent or cautious in determining whether an inmate poses an unreasonable risk to public safety. *Id.*; *In re Shaputis*, 44 Cal.4th at

1258. The governor's decision must still reflect due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, and must be supported by some evidence in the record. *In re Lawrence*, 44 Cal.4th 1181, 1204.

      Here, the panel of the Board that presided over petitioner's 2006 hearing articulated both positive and negative factors bearing on petitioner's suitability for parole, but ultimately weighed those factors in favor of releasing him on parole.

      The Board noted that petitioner's offense could be described as aggravated because it was more than minimally necessary to constitute a second-degree murder. *See* 15 Cal. Code Regs. §2402(c)(1) (circumstances relating to a commitment offense tend to show unsuitability for parole where "[t]he prisoner committed the offense in an especially heinous, atrocious, or cruel manner"); *see also In re Dannenberg*, 35 Cal.4th 1061, 1095 (2005) (in order to find an offense "particularly egregious' to justify the denial of parole, the violence or viciousness of the inmate's crime must have been more than minimally necessary to convict him of the offense for which he is confined). The Board considered petitioner's prior record, which included a non-violent juvenile burglary conviction and a previous felony conviction for robbery. *See* 15 Cal. Code Regs. §2402(c)(2) (an inmate's previous record of violence tends to show unsuitability for parole). The Board also considered petitioner's serious misconduct during the first years of his incarceration. *See* 15 Cal. Code Regs. §2402(c)(6) (institutional behavior shows unsuitability for parole where "[t]he prisoner has engaged in serious misconduct in prison"). There were seven CDC 115 disciplinary reports in petitioner's record. The most recent was issued in 1984 for destruction of state property; petitioner was also involved in a cell fight in 1983 and a stabbing incident in 1982.

      On the other hand, the Board found that petitioner had a stable social history and noted that he performed well in the military. *See* 15 Cal. Code Regs. §2402(d)(2) (a stable social history, where the prisoner has experienced reasonably stable relationships with others, tends to show parole suitability). At the hearing, petitioner demonstrated realistic parole plans including

7

a place to live, various job opportunities, and the existence of family resources. *See* 15 Cal. Code Regs. §2402(d)(9) (an inmate's understanding and plans for the future tend to show parole suitability). Thus, the Board concluded that, despite the negative factors relating to petitioner's criminal history, offense, and misconduct in prison, "for an extensive period of time" those disciplinary problems had been resolved, and petitioner had "worked diligently to improve" himself. He had upgraded himself educationally and availed himself of self-help therapy. By his words and conduct over an extensive period of time, the Board reasoned, he demonstrated that he had matured and accepted ultimate responsibility for his actions, and that he no longer posed a risk to society if released.

Upon review of the same factors, Governor Schwarzenegger reached the opposite conclusion. After reciting a summary of petitioner's offense, his written decision continued:

> Mr. Varner was 24 years old when he perpetrated the life offense. His criminal history began with adjudications at age 16 for trespassing and malicious mischief. His adult history includes convictions for first-degree robbery, obstructing a police officer, driving under the influence, malicious mischief and driving without a driver's license. Mr. Varner was also arrested, but not convicted, for forcible rape.
>
> During his incarceration for the life offense, Mr. Varner was disciplined seven times for rules violations involving, among other things, destruction of state property, fighting in his cell, stimulants and sedatives and stabbing another inmate. According to the incident report for the latter violation, Mr. Varner stabbed the inmate in the chest and the other inmate was transported to a hospital in serious condition. During his 2006 hearing, Mr. Varner denied stabbing the inmate. Mr. Varner was also counseled four times for minor misconduct, most recently in 1988.
>
> I have considered various positive factors in reviewing whether Mr. Varner is suitable for parole at this time. In addition to remaining discipline-free for more than 22 years, Mr. Varner made efforts during his incarceration to enhance his ability to function within the law upon release. He earned a GED in 1998 and an Associate of Arts degree in 2001. He completed vocational training in welding and received additional training in plumbing. He held institutional jobs such as chapel clerk, captain's clerk, assignment clerk, porter and teacher's assistant, and he worked in the food service department. Similarly, he availed himself of an array of self-help and therapy, including Alcoholics Anonymous,

Narcotics Anonymous, Alternatives to Violence, Millati Islamic 12-step program, Squires, Katargeo, Vietnam Veteran's Group, Man Alive and several self-improvement seminars. He participated in extracurricular activities such as the Offender Employment Continuum Program and the Inmate Education Advisory Committee, and he was a literacy tutor. He maintains supportive relationships with family and friends and he received some positive evaluations from mental-health and correctional professionals over the years.

Mr. Varner also made plans upon release from prison to live with his sister and her husband in Alameda County, his county of last legal residence. Although he has marketable skills, he has not secured a job offer there. Having a legitimate way to provide financial support for himself immediately upon release is essential to Mr. Varner's success on parole.

Despite the positive factors I have considered, the second-degree murder for which Mr. Varner was convicted was extremely brutal and callous, because he shot Mr. Summers in the eye and then continued to fire shots into Mr. Summers' back as Mr. Summers lay face down on the ground. In addition, there is some evidence in the record before me that Mr. Varner engaged in some level of premeditation. According to the district attorney's letter, Mr. Varner approached Mr. Summers with a loaded .22 caliber rifle and was heard to say "I been waiting for you all day." He swung the rifle at Mr. Summers' head and tried to fire the weapon three times, but it misfired on each occasion. The district attorney's letter indicated that at this point, Mr. Summers was "frozen in his tracks in fear." Mr. Varner pulled the trigger a fourth time. The weapon fired and the bullet struck Mr. Summers in the eye. Mr. Varner approached Mr. Summers as he lay in the street and fired two additional rounds into his back and a third round which grazed his chest. Mr. Varner then walked back to his car, threw the gun into the front seat and drove away.

Mr. Varner had several opportunities to cease during this crime. He told the 2003 Board that "[w]hen I decided to shoot Sonny the gun had jammed, and I had an opportunity to consider the consequences of my actions, but I chose not to... I was determined to make him pay for his verbal attacks on my father and for his disrespect of me." The sentencing judge stated that "[t]he evidence is clear that he killed this person, and it wasn't just a one-shot situation, but there were additional shots fired while the person was already lying down on the ground, and he just went up to him and put a couple more bullets in him to make sure he was dead. It looked almost like an execution." The gravity of the second-degree murder committed by Mr. Varner is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk. The Alameda County District Attorney's Office and the Oakland Police Department both

>expressed to the 2006 Board their opposition to Mr. Varner's parole, based in part on the gravity of the murder he committed.
>
>At age 50 now, after being incarcerated for more than 25 years, Mr. Varner says he accepts responsibility for the murder and is remorseful for his actions. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the negative factors weighing against Mr. Varner's parole suitability presently outweigh the positive ones tending to support it. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Varner.

(Indeterminate Sentence Parole Release Review by Governor Schwarzenegger, dated October 20, 2006, at 1-2.)

On state habeas corpus review, the Alameda County Superior Court denied petitioner's request for a writ of habeas corpus. After noting it was "not altogether clear" which unsuitability factors the governor had relied upon, the superior court found as follows:

>There is some evidence that Petitioner had a prior record for violence before he committed the murder, which is a factor tending to show unsuitability. (Cal. Code of Regs., tit. 15, § 2402, subd. (c)(2).) In 1976, when he was 21 years old and four years before he was convicted of murder, Petitioner pled guilty to first-degree robbery. It was alleged that Petitioner, a woman and another man attacked the victim of the robbery, with the men slashing the victim with knifes [sic]. At the 2006 hearing Petitioner denied slashing the victim, or initiating and planning the robbery, or knowing that the other man had a knife, although he admitted participation in the robbery.
>
>There is some evidence that Petitioner had engaged in serious misconduct in prison, which is another factor tending to show unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(6).) In 1982 it was alleged that Petitioner stabbed an inmate who was seriously injured. Petitioner denied, at the 2006 hearing, that he was the one that stabbed the inmate. He did admit being involved in a fighting incident with other inmates after three Mexicans ran down the tier and tried to hit him, and then other inmates began to help him.
>
>A circumstance tending to show suitability for parole is when a "prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Cal. Code of Regs., tit. 15, § 2402, subd. (d)(8).) The fact that he has not secured a job offer is not required for a finding of this factor to

10

support suitability. (See *In re Andrade* (2006) 141 Cal. App. 4th 807, 815-818.) Having found that Petitioner does have plans for parole and has marketable skills, the Governor cannot rely on the fact that Petitioner has not secured a job offer to find him unsuitable for parole.

The Governor can look at the circumstances of the offense and rely [on] the facts of the crime alone, so long as it points to factors beyond the minimum elements of the crime, in determining that a prisoner is unsuitable for release. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1070-1071(*Dannenberg*); *Rosenkrantz*, *supra*, 29 Cal.4th 616.) As the *Dannenberg* Court noted, "[t]he regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. (Citation omitted).) Among the specified circumstances of the commitment offense that "tend to indicate unsuitability for release" are that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Citation omitted.)" (*Dannenberg*, *supra*, 34 Cal.4th at p. 1080). A factor to be considered includes that "the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." (Cal. Code of Regs., tit. 15, § 2402, subd. (c)(1)(B).)

...

The Governor relied and cited information contained in the letter written in 1981 by the district attorney who tried the case, which was part of the evidence considered by the Board at the suitability hearing, as well as the comments made by the sentencing judge who presided over the trial. Given the various versions of the facts in this case, the Governor was free [to] discount Petitioner's version of the facts in which he claimed self-defense, just as the jury did in this case. Therefore, the record contains some reliable evidence supporting support [sic] the Governor's finding that the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder to conclude that the commitment offense was *especially* cruel- the murder Petitioner committed was not a commonplace murder. (See *In re Lee* (2006) 143 Cal.App.4th 1400, 1409-1412.)

The Governor also relied on factors beyond the minimum elements of the crime. Here, Petitioner suffered a conviction for second degree murder. (Penal Code §§ 187(a), 188, and 189.) "[A]ll second degree murders by definition involve some callousness-- i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. [Citation.]" (*Smith*, *supra*, 114 Cal.App.4th at p. 366.) Therefore, all second degree murders will involve some amount of viciousness or callousness. (*In re Weider* (2006) 145 Cal.App.4th 570, 587.) Second degree murder is defined as the unlawful killing of a human being with malice aforethought, *but without the additional*

> *elements* of willfulness, premeditation, and deliberation that would support a conviction of first degree murder. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) "Willful" means intentional, deliberate means deciding to act after thoughtful consideration, and premeditated means the act was considered beforehand. (CALJIC 8.20, *People v. Memro* (1995) 11 Cal.4th 786, 863 (*Memro*).) Premeditation and deliberation do not require much time and may be arrived at quickly. (*Memro*, *supra*, 11 Cal.4th at p. 863; *People v. Lenart* (2004) 32 Cal.4th 1107, 1127; *People v. Stitely* (2005) 35 Cal. 4th 514, 543.) Here, there is some evidence, as detailed in the 1981 letter written by the district attorney that prosecuted Petitioner, that Petitioner was waiting for the victim with a loaded .22 rifle, and the Governor was free to discount Petitioner's self-defense version given at trial, which the jury also discounted. Moreover, "[t]he circumstances that the jury, for whatever reason, did not find beyond a reasonable doubt such [as] premeditation and deliberation does not preclude the Governor from considering such evidence in exercising his discretion whether to reverse a Board decision granting parole." (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 678-679.) There is some evidence to support the finding of premeditation and deliberation, therefore, the murder perpetrated by Petitioner was more violent or vicious than minimally necessary to convict him of killing with malice aforethought.
>
> The court is aware that the Board has denied Petitioner parole nine times before it was finally granted, only to have the Governor reverse such decision. However, this Court's review is limited, and it cannot substitute the judgment of Board granting Petitioner parole in reviewing the Governor's reversal. The Governor was free to independently decide the weight to give to the relevant suitability and unsuitability factors. (*Rosenkrantz*, *supra*, 29 Cal.4th at pp. 669-670.) Although it appears that the Governor incorrectly relied on the fact that Petitioner had not secured a job offer to deny him parole, the Governor's decision made clear that the gravity [of the] offense alone would be sufficient to find Petitioner unsuitable for parole. The Governor's determination that Petitioner poses an unreasonable risk of danger to society based on Petitioner's prior record for violence, because Petitioner had engaged in serious misconduct in prison, and because his offense was committed in an especially cruel manner relying upon facts beyond the minimum elements of second degree murder, took into consideration all relevant and reliable factors, and is supported by some evidence. Thus, the Governor's reversal was not arbitrary, capricious, or unreasonable.

(*In re Frederick Varner*, No. 71243, Order Denying Petition for Writ of Habeas Corpus, Alameda County Superior Court, June 3, 2007.)

/////

Petitioner's commitment offense occurred approximately 26 years prior to the 2006 parole suitability determination at issue. The facts of his offense can nevertheless constitute a valid reason to deny parole because there is a rational nexus between those facts and the ultimate conclusion that he was still a threat to public safety. *See In re Lawrence*, 44 Cal.4th at 1214, 1227. Importantly, as both the governor and state superior court noted, petitioner's crime was not an isolated event. Among other, less serious crimes, his record includes a juvenile burglary conviction and a prior violent robbery conviction during which the victim was repeatedly stabbed. During the first few years of his incarceration petitioner was involved in another stabbing incident and got into more than one serious fight. Since then, petitioner successfully changed his behavior and at the time of the 2006 hearing he had been free of discipline for an extensive period of time. The 2006 psychological evaluator noted that petitioner's behavioral improvements demonstrate that he "understands the rules and regulations and is willing to program within the rules of the CDCR society."

Petitioner's behavioral changes and successful programming encouraged the Board to weigh the parole suitability factors in his favor. But the Board itself acknowledged that the same suitability factors it relied upon could have been weighed differently to support the opposite conclusion. In particular, the Board noted that accepting the jury's version of the facts of petitioner's offense potentially called into question his level of insight and acceptance of responsibility because petitioner still claimed he acted in self defense. Moreover, the Board noted that apart from the commitment offense, with respect to other aspects of petitioner's criminality, "one could argue that when discussing the details there's a degree of minimization or not full acceptance." (Subsequent Parole Consideration Hearing Transcript ("Transcript"), Board of Parole Hearings, May 26, 2006, at 81.) For example, petitioner denies that he initiated or planned the robbery for which he was convicted, insisting instead that he came upon it by surprise when one co-defendant told him that the other female co-defendant was being beat up around the corner and needed help. By the time petitioner "got with them they'd already plunged

1  and began the process of robbing the gentleman." (Trancript at 38.)  Petitioner also denies that
2  he stabbed another inmate during a fight at Folsom State Prison although he received a
3  disciplinary report for doing so.  (Transcript at 43.)
4           On this record, a conclusion that petitioner was not suitable for parole was
5  supported by "some evidence" in the record.  The California Supreme Court has held that the
6  governor is entitled to rely on the facts of the commitment offense where, as here, they are
7  particularly egregious.  *In re Dannenberg*, 34 Cal.4th at 1095; *see also Irons*, 505 F.3d at 853.
8  Moreover, it was reasonable for the governor to conclude that the facts of petitioner's offense
9  remained probative to a determination of his suitability for parole in light of his criminal history,
10 which included a prior violent robbery, and his serious misconduct in prison, which included
11 more than one violent episode.  Although there were many positive factors in the record which
12 were supportive of petitioner's release, this court is not authorized to re-weigh those factors,
13 substituting its judgment for that of Governor Schwarzenegger.  In this case, the circumstances of
14 petitioner's commitment offense, criminal history, and previous serious misconduct in prison
15 provide the required modicum of evidence to support the governor's reversal of the Board's grant
16 of parole.

### VI.  CONCLUSION

18          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's
19 application for writ of habeas corpus be DENIED.
20          These findings and recommendations are submitted to the United States District
21 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-
22 one days after being served with these findings and recommendations, any party may file written
23 objections with the court and serve a copy on all parties.  Such a document should be captioned
24 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
25 shall be served and filed within seven days after service of the objections.  Failure to file
26 objections within the specified time may waive the right to appeal the District Court's order.

*Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: July 30, 2010

/s/ Charlene H. Sorrentino
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE